# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **ESTHER L. WOODRUFF,** | ) | **CASE NO.  4:06 CV 2276** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF CAMPBELL, et. al.,.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court upon Defendants Marc Eichert and Michael Slivanya's Motion for Summary Judgment.[1]  (Dkt. # 47).  Also before the Court is Defendants Kevin Sferra, Bryan Rauzan, and Clarence Hudson's Motion for Summary Judgment.  (Dkt. # 48).

## I.      FACTUAL BACKGROUND

Plaintiff Esther L. Woodruff, individually and as Administratrix of the estate of  the decedent William S. Woodruff ( "Woodruff"), brings the instant action for money damages against several law enforcement entities and officers, including Officers Kevin Sferra ("Sferra"), Bryan Rauzan ("Rauzan"), and Clarence Hudson ("Hudson") of the City of Campbell Police Department, and Marc Eichert ("Eichert"), and Michael Slivanya

---

[1]
The Court notes that although Defendants moved on behalf of Coistville township in addition to Defendants Marc Eichert and Michael Slivanya, the issue of township liability is not before the Court at this stage. As the Court is only addressing whether the individual Defendants are entitled to qualified immunity, the Court will not discuss the liability of Coitsville Township in the instant motion.

("Slivanya") of the Coitsville Township Police Department.

Plaintiff's Complaint, filed pursuant to 42 U.S.C. § 1983, alleges that when Woodruff was stopped by officers Eichert, Rauzan, Slivanya and Sferra for failing to control his dogs, he cooperated with the officers instructions and "posed no threat," but despite his cooperation, the Defendants "threw the decedent on the ground face first, and two of them knelt on his back and neck." (Dkt. #37).  When Woodruff exclaimed that he was paralyzed and unable to move, the officers allegedly picked Woodruff up and "threw him into the car head first." (Dkt. 49).  Plaintiff further alleges that when Woodruff was taken to the Campbell Police Department, Hudson did not provide him with medical attention necessary to treat the injuries he sustained during the arrest. (Comp., ¶25).  Plaintiff contends that Woodruff died as a result of the injuries inflicted by Defendants and the subsequent failure of Defendants to properly treat those injuries.  The coroner's report stated that Woodruff died of hypoxic encephalopathy, due to cervical spine contusion from a blunt force trauma. (Dkt. #1).

## II.    PROCEDURAL HISTORY

On September 20, 2006, Plaintiff filed a Complaint, naming as defendants officers Sferra, Rauzan, Hudson, Slivanya, and Eichert, as well as the City of Campbell Police Department and the Coitsville Township Police Department.  Plaintiff asserts claims under Ohio law for wrongful death, survivorship, and willful, wanton and reckless conduct.  The Complaint also asserts a claim pursuant to 42 U.S.C. § 1983 for violation of Woodruff's Fourth, Eighth and Fourteenth Amendment constitutional rights.

2

The Defendants claim qualified immunity and move for summary judgment, contending that contrary to the allegations in the Complaint, the officers did use any force upon the neck area of Woodruff.  Defendants also assert that there was never any indication that Woodruff was in need of medical attention.  In addition, Defendants Eichert, and Slivanya argue that they are not the government agency responsible for Woodruff's injuries, because Woodruff was never in the jurisdiction or custody of the Campbell Police Department officers.  (Dkt. #32).  The instant motions ensued.

## III.  STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56 (c).  "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks

3

Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)). The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25). The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## III.   LAW

When officials are sued in their individual capacities pursuant to section 1983, they may be protected from liability for damages if their alleged wrongful conduct was committed

4

while they performed a function protected by qualified immunity.  See Cagle v. Gilley, 957 F.2d 1347, 1348 (6th Cir.1992).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  The privilege is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Id. Consequently, qualified immunity questions must be resolved at the earliest possible stage in litigation.  See Saucier v. Katz, 533 U.S. 194 (2001).

Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1981).  In order to assert a violation of a "clearly established" right and defeat a qualified immunity defense, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  In other words, "in the light of pre-existing law the unlawfulness must be apparent."  Id.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

Consequently, the Court utilizes a three-step test in determining whether qualified immunity applies:  (1) whether, "based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred;"  (2) "whether the violation involved a clearly established constitutional right of which a

5

reasonable person would have known;" and (3) "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003); see also Barnes v. Wright, 449 F.3d 709 (6th Cir. 2006); Sample v. Bailey, 409 F.3d 689, 695 (6th Cir. 2005); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004).  "If the answer to all three questions is 'yes,' qualified immunity is not proper." Id.

Individual claims of immunity must be analyzed on a fact-specific, case-by-case basis to determine whether the constitutional rights were so clearly established when the alleged misconduct was committed that any official in the defendant's position would understand that what they were doing violates those rights.  See Anderson, 483 U.S. 635, 640 (1987).

It is the province of the jury, not the court, to decide any factual disputes.  However, the court ultimately decides the question of whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct."  Adams v. Metiva, 31 F.3d 375, 387 (1994).

## IV.  ANALYSIS

The section 1983 claims in the case *sub judice* arise from the following constitutional rights: (1) the individual officers' alleged use of excessive force in violation of Woodruff's Fourth Amendment rights, as secured by the Fourteenth Amendment; and (2) the denial of Woodruff's right to medical care under the Fourteenth Amendment following his arrest.

**A.      Fourth Amendment Claim**

**1. *Constitutional violation***

The first step in any qualified immunity analysis is to determine whether the facts, viewed in the light most favorable to Plaintiffs, show that a constitutional violation could be found.  See Feathers, 319 F.3d at 848 (6th Cir. 2003).  This Court has held that individuals have a right under the Fourth Amendment to be free of excessive force when police make an arrest or seizure.  See  Lyons v. City of Xenia, 417 F.3d 565, 575 (6th Cir.2005) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). It is also well-established that "[t]he Fourth Amendment [] prohibits unduly tight handcuffing in the course of an arrest." Lyons, 417 F.3d at 575 (citing Martin v. Heideman, 106 F.3d 1308, 1313 (6th Cir.1997); Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir.1993)).     Furthermore, "[a]ll claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest . . . of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  Graham, 490 U.S. at 395 (1989).  "In making this evaluation, courts look at '(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Id.  As the Supreme Court stated in Graham:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight .
> . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments–in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation.

490 U.S. at 396-97.

Defendants contend that they only used the amount of force necessary to arrest Woodruff.  Defendants claim that Woodruff was very intoxicated and acting in a disruptive and disorderly manner when the Campbell officers arrived on the scene.  (Dkt. # 48-2, Rauzan Aff.).  The Campbell officers contacted the Coitsville Township Police Department for assistance, pursuant to a mutual aid agreement between the two police departments.  The Coitsville Township Police Department dispatched Officers Slivanya and Sferra, who arrived on the scene shortly thereafter.  (Dkt. # 48-2, Rauzan Aff., Sferra Aff.)  When the officers informed Woodruff that he would be arrested, he attempted to hide in his backyard.  (Dkt. # 47-2, Eichert Aff.).  Eichert found Woodruff hiding in his backyard and returned him to the custody of Rauzan.  (Dkt. # 47-2, Eichert Aff.).

Rauzan contends that Woodruff was then placed under arrest and handcuffed behind his back.  (Dkt. # 48-2, Rauzan Aff.).  Rauzan, Slivanya, Sferra, and Eichert picked Woodruff up, carried him to the cruiser, and placed him into the back seat.  (Dkt. #s 47-2, Eichert Aff.; 48-2, Sferra Aff., Rauzan Aff.).  Defendants attest that the level of force used was objectively reasonable to handcuff Woodruff and place him in the patrol car.

Plaintiff responds by submitting affidavits from a witness, Esther O'Malley ("O'Malley"), who claims that the officers threw Woodruff to the ground and knelt on his back and neck.  (Dkt. #37, Ex. A).  Michael Strozier ("Strozier"), another witness to the incident, similarly stated that he saw "the biggest cop" on top of Woodruff with his knees on

8

Woodruff's back and neck.  (Dkt. #27, Ex. B).  O'Malley estimated that while this cop weighed well over 300 pounds and stood 6'3", Woodruff weighed only 125 pounds.  Strozier also states that after the officers handcuffed Woodruff, they threw Woodruff into the patrol car where he "landed head first on the floor." (Dkt. #27, Ex. B).  Plaintiff avers that this force was excessive given that Woodruff never resisted arrest or posed a threat to the officers.

Viewing the facts in the Plaintiff's favor, there is a genuine issue of material fact whether Woodruff's Fourth Amendment rights were violated by Defendants Rauzan, Eichert, Slivanya, and Sferra.  The Court finds that a question of fact remains whether Defendants' subsequent use of force to effectuate the arrest, specifically throwing Woodruff on the ground and applying force to his neck, was 'objectively reasonable' in light of the facts and circumstances of the situation.  In a light most favorable to the Plaintiff, the Court cannot say that Defendants' actions were reasonable.

## 2. *Clearly established right*

After establishing a potential violation of Woodruff's constitutional rights, the second step in the qualified immunity analysis is to determine whether that right was clearly established.  See Feathers, 319 F.3d at 848.  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Sample, 409 F.3d at 698 (quoting Anderson, 483 U.S. at 640).  "In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to

decisions of other circuits." Id. (quoting Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir.1993)).

The Court finds that Woodruff's constitutional right to be free from excessive force was clearly established at the time of his arrest. The Supreme Court has held that the right to be free from excessive force is a clearly established right under the Fourth Amendment which can give rise to a claim pursuant to 42 U.S.C. § 1983. See Tennessee v. Garner, 471 U.S. 1 (1985). Likewise, the Sixth Circuit has consistently followed this holding. See Neague v. Cynkar, 258 F.3d 504, 507 ("the right to be free from excessive force is a clearly established Fourth Amendment right"); Adams, 31 F.3d at 386-87 (the right "to be free from the use of excessive force under the Fourth Amendment . . . [is] clearly established.")(internal citations omitted); Dickerson v. McClellan, 101 F.3d 115, 1162-63 (6th Cir.1996).

### 3. *Objectively reasonable*

Finally, in completing the qualified immunity analysis, the Court must determine whether the Plaintiff have offered sufficient evidence to indicate that what the officers allegedly did was objectively unreasonable in light of the clearly established constitutional right. See Feathers, 319 F.3d at 848. In the instant matter, the Court finds that Plaintiff has produced sufficient evidence to overcome summary judgment. Further, because of the contested facts surrounding Woodruff's arrest, a question exists as to whether the officers actions were objectively unreasonable. See Dickerson, 101 F.3d at 1158 ("Summary judgment is not appropriate if there is a genuine factual dispute relating to whether

10

[defendant] committed acts that allegedly violated clearly established rights.").

Accordingly, the Court holds that the events surrounding Woodruff's arrest and transfer to the Campbell Police Department create a genuine issue of material fact as to whether the officers used excessive force during Woodruff's arrest.  Thus, Rauzan, Eichert, Slivanya, and Sferra are not entitled to qualified immunity with regard to Plaintiffs' Fourth Amendment claim.

Plaintiff has not demonstrated, however, that there is a genuine issue of material fact whether Woodruff's Fourth Amendment rights were violated by Defendant Hudson.  Hudson states that he was assigned as the dispatcher at the City of Campbell Police Department during the arrest.  (Dkt. #33, Hudson Aff.).  Plaintiff has not put forward facts alleging that Hudson used any force against Woodruff.  As officer Hudson was not present during the arrest, he is entitled to qualified immunity.

### B.  Fourteenth Amendment

Plaintiff contends that Defendants violated their duty to assess and provide proper medical care to Woodruff during his arrest and detainment.  As reasoned above, the initial inquiry in the qualified immunity analysis is whether a constitutional right was violated.  See Estate of Carter v. City of Detroit, 408 F.3d 305, 311 (6th Cir.2005).  The Coistville officers draw a factual distinction between their involvement in Woodruff's medical care and the involvement of the City of Campbell officers, thus their claims will be addressed separately.

### 1.  *Rauzan, Sferra, and Hudson*

The Due Process Clause of the Fourteenth Amendment prevents state actors from

11

denying life, liberty, or property without due process of law.  See DeShaney v. Winnebago Co. Dep't of Social Services, 489 U.S. 189, 195 (1989); see also Kallstrom v. City of Columbus, 136 F.3d 1055, 1065 (6th Cir.1998).  Moreover, in section 1983 claims, the Sixth Circuit has held that the Fourteenth Amendment affords pre-trial detainees the right to "adequate medical treatment."  Watkins v. City of Battle Creek, 273 F.3d 682, 685 (6th Cir.2001); see also Estate of Carter, 408 F.3d at 311.

To succeed on such a claim, the plaintiff must demonstrate that the defendant acted with "deliberate indifference to the serious medical needs" of the pre-trial detainee.  Watkins, 273 F.3d at 686 (quoting Estelle v. Gamble, 429 U.S. 97 (1976).  More than mere negligence, "[d]eliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety."  Watkins, 273 F.3d at 686 (6th Cir. 2001).  Deliberate indifference may be shown by proving both an objective component, (1) "the existence of a 'sufficiently serious' medical need" on behalf of the plaintiff; and a subjective component, (2) "a sufficiently culpable state of mind in denying medical care" on the part of the defendant.  Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir.2004)(quoting Farmer v. Brennan, 511 U.S. 825, 834).

The Sixth Circuit has adopted  an "obviousness" approach in determining what constitutes a serious medical need:

> Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem [whereas] delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute a [constitutional] violation.

Blackmore, 390 F.3d at 897 (citations omitted). In Blackmore, the Sixth Circuit held that Blackmore's appendicitis was an "obvious" illness because, while in police custody, he complained of sharp and sever stomach pains for two days and vomited.  These symptoms, the court reasoned, were "classic signs of appendicitis."  Id. at 900.

According to the Campbell police officers, Woodruff exclaimed that he was paralyzed at the time of the arrest.  (Dkt. # 47-2, Eichert Aff.).  Witness O'Malley states that  Woodruff was "limp and his legs were hanging like spaghetti" when the officers carried him to the police cruiser around 10:00 p.m.  (O'Malley Aff.).  Woodruff continued to complain of paralysis during his trip to the City of Campbell Police Department .  Hudson, who was in charge of monitoring Woodruff while he was in a holding room at City of Campbell Police Department, states Woodruff was conscious but appeared to be intoxicated when he arrived at the police department.  (Dkt. # 48-2, Hudson Aff.).  Hudson observed Woodruff in the holding room from a television monitor, and claims that he checked on Woodruff every 10-20 minutes and Woodruff appeared to be sleeping and breathing normally .  (Dkt. # 48- 2, Hudson Aff.).  At approximately 10:57 p.m., Hudson returned to the holding room and found Woodfuff unresponsive and not breathing.  (Dkt. # 48-2, Hudson Aff.).  Woodruff remained in a coma and died two weeks later.

Woodruff complained of paralysis at the time he was arrested around 9:00 p.m. and the officers had to carry him to the police car.  The statements of Witness O'Malley, a lay person, demonstrate that Woodruff exhibited physical symptoms consistent with his

complaints.  While under the observation of Hudson, who claimed that Woodruff appeared to be sleeping, Woodruff fell into a coma and remained unresponsive until his death two weeks later.  The coroner's report stated that Woodruff died of hypoxic encephalopathy, due to cervical spine contusion from a blunt force trauma.  The obviousness of Woodruff's condition, in combination of potential severe consequences, satisfies the objective requirement of the failure to provide adequate treatment test.

The next question is whether Plaintiff has demonstrated that Sferra, Rauzan, and Hudson possessed a "sufficiently culpable state of mind in denying medical care" to Woodfuff.  It is insufficient for Plaintiffs to demonstrate that a substantial risk of serious harm to Woodruff existed.  Rather, the officers must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and they must also have drawn that inference.  <u>Blackmore</u>, 390 F.3d 890, 895 (6th Cir.2004) (quoting <u>Farmer</u>, 511 U.S. 825, 834).  "If an officer failed to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the . . . Fourteenth Amendment[]."  <u>Estate of Carter</u>, 408 F.3d at 312 (citations omitted).

There is substantial evidence before the Court that Sferra and Rauzan were fully aware of all the symptoms Woodruff displayed .  Woodruff told the officers he was paralyzed and was unable to move.  There is also evidence from which it could be construed that Sferra and Rauzan acknowledged that Woodruff was suffering from a serious medical problem, as they had to carry him to the police cruiser because he was unable to walk.  Although the officers claim that Woodruff's actions were more consistent with an intoxicated person, and

did not actually believe that Woodruff was paralyzed, it is for a jury to resolve conflicting inferences.  See Johnson, 398 F.3d at 876.

The Court notes that it is not necessary for Plaintiff to offer explicit evidence that the officers in fact drew the inference.  In most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew.   Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component.  In Garretson v. City of Madison Heights, a the Sixth Circuit held that where one named and one unnamed officer were told by the plaintiff pre-trial detainee that she was a diabetic in need of insulin, and was past due for her next dose, a genuine issue of material fact existed as to whether the two acted with deliberate indifference to her medical needs in failing to have her transported to the hospital.  407 F.3d 789, 2005 U.S. App. LEXIS 7164, 2005 WL 1076560, at *4 (6th Cir. 2005).  Woodruff's situation was similar because Sferra, Rauzan, and Hudson were both directly informed by Woodruff that he was paralyzed and Woodruff exhibited signs of paralysis.

There is also evidence from which a jury can infer that Sferra, Rauzan, and Hudson disregarded the substantial risk of serious harm to Woodruff's health.  For purposes of avoiding summary judgment, Plaintiff has sufficiently demonstrated deliberate indifference.  Again, taking the facts in a light most favorable to the plaintiff, Sferra and Rauzan did not inform anyone at the Campbell Police Department that Woodruff complained of paralysis at the time of the arrest and had to be carried to the police cruiser.  Hudson, who allegedly

monitored and checked on Woodruff in the holding cell, did not call for help until Woodruff was completely unresponsive and in a coma.

In sum, based the alleged facts taken in the light most favorable to Woodruff, there is a genuine issue of material fact that Woodruff's medical need was sufficiently serious, the Campbell police officers were aware that he was in serious need and disregarded it, and Sferra, Razuan, and Hudson therefore violated Woodruff's right to be free from deliberate indifference to his serious medical need.

Finally, to complete the qualified immunity analysis, this right was clearly established at the time of Woodruff's violation.  As early as 1972, this court stated that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." Fitzke v. Shappell, 468 F.2d 1072, 1076 (6th Cir. 1972). Furthermore, in 1992, the Sixth Circuit explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987.  Heflin v. Stewart County, 958 F.2d 709, 717 (6th Cir. 1992).  The right that Woodruff violated was therefore clearly established. Under the facts alleged by Plaintiff, Sferra, Rauzan and Hudson are not entitled to qualified immunity.

## 2. *Eichert and Slivanya*

Coitsville officers Eichert and Slivanya assert that qualified immunity should be granted with respect to Plaintiff's medical indifference claim because they are not the government agency responsible for providing medical treatment.  Eichert and Slivanya cite

Weeks v. Portage Cty. Exec. Officers, 235 F.3d 492 (6th Cir. 2002) for the proposition that a "special relationship" must exist between an individual and the police in order to give rise to a medical indifference claim.  This "special relationship," the officers argue, does not arise until the police have the individual in custody.

Defendants' reliance on Weeks is misplaced.  In Weeks, the Sixth Circuit dealt with the issue of when a police officer has an *affirmative duty* to protect an individual from a private actor.  The court held that unless the police have a "special relationship" with the victim, the victim has no constitutional right to have the police provide medical assistance or intervene to protect him from the actions of private actors.  Weeks, 235 F.3d at 278; See Tucker v. Callahan, 867 F.2d 909, 914 (6th Cir. 1989) ("The failure to provide medical assistance is not actionable under § 1983 for the same reason that the failure to intervene in the fight is not: in neither case did the state actor cause the injury of which plaintiff complains.").  This line of cases is distinguishable from the case at bar, where the duty to provide medical assistance stems from alleged police misconduct and not the actions of a private individual.

"The proper inquiry in determining whether someone is placed in custody is whether there was a restraint on personal liberty similar to those highlighted in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249(1989).  Jackson, 429 F.3d at 590.  The Supreme Court in DeShaney recognized a line of cases "stand[ing] . . . for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty

17

to assume some responsibility for his safety and general well-being." 489 U.S. at 199-200. The restraints on liberty mentioned in <u>DeShaney</u> involved the application or threat of force and a show of authority made with the intent of acquiring physical control. <u>Jackson</u>, 429 F.3d at 590. Accordingly, this custody exception to the general rule of nonliability for § 1983 claims based on the government's failure to provide adequate medical care has been applied only to cases involving prisoners, <u>Estelle</u>, 429 U.S. at 103-04; pretrial detainees, <u>City of Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983); those involuntarily committed to mental institutions, <u>Youngberg</u>, 457 U.S. at 315; and foster children, <u>Nicini v. Morra</u>, 212 F.3d 798, 808 (3d Cir. 2000). "The overarching prerequisite for custody is an affirmative act by the state that restrains the ability of an individual to act on his own behalf." <u>Jackso</u>n, 429 F.3d at 590 (citing <u>Stemler v. City of Florence</u>, 126 F.3d 856, 868 (6th Cir. 1997)).

The Court notes that the Sixth Circuit rejected an argument similar to the argument advanced by the Coistsville officers in <u>Estate of Owensby v. City of Cinncinnati</u>. In that case, the decedent's estate filed an action pursuant to 42 U.S.C. § 1983, alleging claims against individual police officers from the City of Cincinnati and the Village of Golf Manor. Similar to the arrangement between Coistsville Township and the City of Campbell, the two police departments in <u>Owensby</u> were signatories to a mutual aid agreement for law enforcement that provided for reciprocal police services across jurisdictional lines. The Golf Manor police officers argued that they owed decedent no constitutional duty because decedent was in the custody of the Cincinnati police officers, not theirs. The court rejected

that argument because even though the arrest did not occur in Golf Manor's jurisdiction, the Golf Manor officers later had custody of the decedent when they locked him in their police cruiser.  The court, therefore, found that the Golf Manor officers had custody of the decent at the time he was in their cruiser, and denied the officers qualified immunity with respect to their medical indifference claim.

Therefore, the Court must assess whether Eichert and Slivanya applied the requisite force or threat of force and a show of authority made with the intent of acquiring physical control.  See Jackson, 429 F.3d at 590.  In the instant case, Eichert admits that he escorted Woodruff to the City of Campbell police officers when Woodruff tried to escape and held Woodruff's left hand as he was being handcuffed.  (Dkt. #47).  Furthermore, both Slivanya and Eichert helped carry Woodruff to the City of Campbell police cruiser after Woodruff was handcuffed.  (Dkt. #47; Dkt. # 42; Compl. & 23, 24; Dkt. # 50; Dkt. # 50-3, Michael Strozier Aff.; Dkt. # 49-2; O'Malley Aff.).  In so doing, the officers took the "affirmative  act of restraining [Woodruff's] freedom to act on [his] own behalf," and consequently imposed upon themselves a duty to ensure that they were not placing his in danger.  Their actions were, in the words of DeShaney, a restraint on Woodruffs personal liberty, not a failure to act on her behalf.  This custody, therefore, gives rise to Eichert and Slivany's duty to provide adequate medical care.

As a result, the Court must assess whether Plaintiff can establish the objective and subjective components of a medical indifference claim, as outlined above.  As stated earlier, the record reveals that Woodruff suffered from a sufficiently serious medical need.  The

second question, therefore, is whether Plaintiff has demonstrated that Eichert and Slivanya possessed a "sufficiently culpable state of mind in denying medical care" to Woodruff.

Eichert and Slivanya must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and they must also have drawn that inference. Blackmore, 390 F.3d 890, 895 (6th Cir.2004) (quoting Farmer, 511 U.S. 825, 834). "If an officer failed to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the . . . Fourteenth Amendment[]." Estate of Carter, 408 F.3d at 312 (citations omitted). Eichert and Slivanya argue that because they only witnessed Woodruff at the time of the arrest, they were not aware that a substantial risk of serious harm existed. To the contrary, Eichert and Slivanya were present and assisted when Woodruff was handcuffed. Eichert and Slivanya heard Woodruff claim that he was paralyzed and helped carry him to the cruiser because he was unable to walk. Similar to Rauzan and Sferra, the Coistville Township officers assert that Woodruff's behavior was more consistent with an individual who was intoxicated. Again, a jury should make that determination. See Johnson, 398 F.3d at 876.

Therefore, based the alleged facts taken in the light most favorable to Woodruff, there is a genuine issue of material fact whether Woodruff's medical need was sufficiently serious, that the Coitsville officers were aware that he was in serious need, and disregarded it, and therefore violated Woodruff's right to be free from deliberate indifference to his serious medical need. As the Court has already determined that the right to medical care was clearly established at the time of Woodruff's violation, Eichert and Slivanya are not entitled to

qualified immunity.

**C. Discovery**

In her Brief in Opposition, Plaintiff asks the Court not to consider the instant motions until more thorough discovery is conducted. (Dkt. #37).  Plaintiff cites Myers v. Potter, 422 F. 3d 347 (6th Cir. 2005), warning this Court that "the Sixth Circuit reversed the district court's stay of discovery and grant of the defendant's motion for summary judgment in a § 1983 case."  The Court notes that Plaintiff completely misconstrues Myers.  In Myers, the Sixth Circuit held that the District Court's stay of discovery was not appropriate with respect to a municipality's defenses under § 1983.  The Myers court pointed out that "unlike the qualified immunity entitlement, municipal defenses under § 1983 are not a right to immunity but a mere defense to liability."  Therefore, the Court reasoned, there is no necessity for a district court to render an early decision, prior to a reasonable period of discovery, regarding a municipality's defense.

The Myers court emphasized the need to stay discovery during the resolution of qualified immunity, and upheld the district court's decision to do so with respect to the qualified immunity claims.  Indeed, "one of the purposes of the Harlow qualified immunity standard is to protect public officials from the broad-ranging discovery that can be peculiarly disruptive of effective  government."  Anderson v. Creighton, 483 U.S. 635, 646 (1987) (internal quotation marks omitted).  Therefore, officials are entitled to a stay of discovery pending the Court's ruling on their motion for summary judgment based on qualified immunity.  See  Anderson, 483 U.S. at 646 n.6 ("[D]iscovery may be necessary before

Anderson's motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of Anderson's qualified immunity."); accord Poe v. Haydon, 853 F.2d 418 (6th Cir. 1988). Therefore, the Court requires that the request for discover be presented in writing pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. Here, there has been no specific request for discovery in writing.

## V.    CONCLUSION

For the foregoing reasons, the Court hereby orders that Defendants Sferra, Rauzan, and Hudson's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**. (Dkt. # 48). Judgment is **GRANTED** in favor of Defendant Hudson on Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 arising from violations of the Fourth Amendment. The motion is **DENIED** with respect to Defendants Sferra and Rauzan with regard to the Plaintiffs' claim brought pursuant to 42 U.S.C. § 1983 arising from violations of the Fourth Amendment. The motion is **DENIED** with respect to Defendants Hudson, Sferra and Rauzan with regard to the Plaintiff's claim brought pursuant to 42 U.S.C. § 1983 arising from violations of the Fourteenth Amendment.

Defendants Eichert and Slivanya's Motion for Summary Judgment is **DENIED.** (Dkt. #47).

The Court orders that a second case management conference shall be held on August 9, 2007 at 10:30 a.m.  Counsel shall appear in person**.**

**IT IS SO ORDERED.**

*/s/ Peter C. Economus* **– July 25, 2007**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**